# Exhibit ˚

## INTELLECTUAL PROPERTY LICENSE AND
## PURCHASE OPTIONAGREEMENT

THIS INTELLECTUAL PROPERTY LICENSE AND PURCHASE OPTION AGREEMENT (this "**Agreement**") is made effective the ____ day of _____, 2013 (the "**Effective Date**"), by and between **NEW YORK PREPARATORY SCHOOL, INC.**, d/b/a The Dwight School, a New York education corporation ("**Licensor**"), and **LEGACY GLOBAL GROUP, LLC**, a New York limited liability company ("**Licensee**").

## 1.    BACKGROUND.

WHEREAS, Licensor is the lawful owner of certain Trademarks and Copyrights (as defined in Schedule 1 attached hereto and made a part hereof, as the same may be modified from time to time as provided in this Agreement) (collectively, the "**Licensed IP**");

WHEREAS, Licensee desires to use the Trademarks and copy, reproduce, publicly display, publicly perform and distribute the Copyrights solely in connection with the Services (as hereinafter defined), and to sublicense the Licensed IP solely in connection with the Services (as hereinafter defined).

WHEREAS, Licensor desires to grant to Licensee and Licensee desires to accept from Licensor an exclusive, worldwide, royalty-bearing license to use the Trademarks and copy, reproduce, publicly display, publicly perform and distribute the Copyrights, as set forth in this Agreement.

NOW, THEREFORE, based upon these premises and the promises in this Agreement, Licensor and Licensee hereby agree as follows:

## 2.    DEFINITIONS.

2.1    "**Affiliate**" shall mean, any entity which controls, is controlled by or under common control with a party, or any partnership, joint venture, consortium or other entity in which a party or its Affiliates have greater than fifty percent (50%) legal or beneficial ownership interest.  For the purpose of this definition "controls, is controlled by or under common control" shall mean the possession, directly or indirectly of the power to direct or cause the direction of the management and policies of a Person whether by contract or through the ownership of voting securities, partnership, membership or similar interest in such Person.

2.2    "**Confidential Information**" shall mean Know-How and any and all additional information, other than Trade Secrets, that Licensor or Licensor discloses to Licensee (whether orally or in written, electronic or some other form, including by observation) and which Licensor or Licensor designates as confidential or is treated as confidential or secret by Licensor or Licensor or its Affiliates, including, without limitation, the existence and nature of the relationship between the parties, the Licensed IP and IP Documentation and all information related thereto and all other information or documentation related to the operation of the Licensor or Licensor's business.

2.3    "**Know-How**" shall mean knowledge and related technical information including, but not limited to, services, processes, procedures, specifications, design data and criteria, and testing techniques, related to preparing and using the Licensed IP.

2.4    "**IP Documentation**" shall mean technical information, documents, formulas, processes, data, specifications, drawings, reports, proposals, test results, and other similar information related thereto.

{00021381 v6}

2.5 **"Person"** shall mean any individual, corporation, partnership, limited liability company, trust, association or other entity or organization, including any governmental or political subdivision or any agency or instrumentality thereof.

2.6 **"Representatives"** shall mean, individually and collectively, officers, directors, employees, agents, and/or independent contractors.

2.7 **"Services"** shall mean the provision of educational services to students from the nursery school level through Twelfth (12th) grade.

2.8 **"Sublicensee"** means any third party to whom rights are granted by Licensee with respect to the Licensed IP.

2.9 **"Territory"** shall mean the world.

2.10 **"Trade Secret"** shall mean any information that constitutes a trade secret under the laws of the State of New York.

## 3. LICENSE; SUBLICENSING.

3.1 **License Grant**. Subject to the terms and conditions of this Agreement and in consideration of payment of the License Fee provided for in Section 3.4 of this Agreement, Licensor hereby grants to Licensee during the Term, an exclusive (except as to Licensor as set forth in Section 3.6), worldwide, non-transferable, royalty-bearing license to:

(a) use the Trademarks and the Know-How, as set forth in this Agreement; and

(b) copy, reproduce, publicly display, publicly perform and distribute the Copyrights, as set forth in this Agreement,

in each case solely in the Territory in connection with the provision of the Services in the Territory, together with the right to sublicense as set forth in Section 3.5 (the "**License**").

3.2 **Limitations**. No provision of this Agreement confers upon Licensee any right, title or interest in the Licensed IP, or any portion thereof, except the license granted herein. Licensee acknowledges that it owns no right, title or interest in or to the Licensed IP, or any portion thereof, and shall not challenge the ownership, validity or enforceability of the Licensed IP. Licensee shall obtain no implied license rights to the Licensed IP, and all other rights in and to the Licensed IP not expressly granted to Licensee herein are reserved and retained by Licensor.

3.3 **Restrictions on Use**. Except as expressly authorized in this Agreement, Licensee shall not, and shall not permit others to: (a) market, distribute, sublicense, lease or rent the Licensed IP; or (b) edit, modify or revise the Licensed IP in any manner whatsoever without first obtaining Licensor's prior written consent thereto, which may be granted or withheld in Licensor's sole discretion.

3.4 **License Fee**.

(a) Licensee hereby agrees to pay to Licensor (i) an initial license fee of **Forty-Five Thousand Dollars ($45,000.00** plus (ii) such additional payments and on such terms as shall be determined by the parties with reference to a transfer pricing study of the License to be conducted by

{00021381 v6}

2

Licensor (the "**License Fee**"), each such payment being due and payable on the first (1st) day of each such calendar quarter during the Term, in exchange for the Company's grant to Licensee of the License. Licensee and Licensor acknowledge and agree that the License Fee reasonably and fairly compensates Licensor for the time, effort and costs associated with Licensor's fulfillment of its obligations under this Agreement. Periodically, the parties agree to review the License Fee to ensure that it remains consistent with prevailing market rates.

(b)    Licensee will be responsible for all taxes (including, without limitation, any applicable withholding taxes), customs, duties, assessments, excise fees and other charges based upon the importation of, or assessment against, the Services and any items supplied by Licensor to Licensee under this Agreement, as well as all Licensee's costs of doing business, and Licensor shall have no liability therefor.

(c)    **Notification of Tax Requirements.** Licensee will provide Licensor with reasonable advance notice of any requirement that Licensor file tax returns or other government documents under any applicable laws in the Territory, except as may be required under any applicable federal or state laws of the United States, with respect to any payments remitted by Licensee to Licensor hereunder and, upon Licensor's request and at Licensor's expense, Licensee will prepare and file any such tax returns or other government documents on Licensor's behalf on or before the applicable due date. Further, if any new or revised law(s) are promulgated in the Territory establishing fees, taxes or other impositions relating to any payments to be remitted by Licensee to Licensor hereunder, Licensee will use commercially reasonable efforts to notify Licensor immediately of such new or revised law(s).

3.5    **Sublicensing.**

(a)    Licensee shall not, without the prior written approval of Licensor, sublicense any of the rights licensed hereunder or permit any Sublicensees to further sublicense such rights. Any sublicense of any such rights licensed hereunder without Licensor's prior, written approval shall be null and void. Licensee shall notify Licensor in writing and provide Licensor with a complete copy of each sublicense agreement entered into by Licensee granting Sublicensee rights to any and all rights licensed hereunder and each amendment thereto within ten (10) days after their execution. No sublicense shall nullify these provisions, and all later sublicenses shall be made likewise only after the prior written approval of Licensor is obtained in each instance.

(b)    Licensee shall not grant sublicenses to the rights granted hereunder for no consideration or solely in exchange for the grant to Licensee of intellectual property rights unrelated to the Licensed IP.

(c)    Licensee shall be responsible to Licensor for the performance of its Sublicensees under each sublicense agreement granting rights to any Licensed IP, and Licensee shall be fully responsible to Licensor for any breach of the terms of this Agreement by a Sublicensee.

3.6    **Reservation of Rights.** Notwithstanding anything to the contrary herein, Licensor hereby reserves the right to use the Trademarks and copy, reproduce, publicly display, publicly perform and distribute the Copyrights in connection with Licensor's provision and performance of the Services in the State of New York.

{00021381 v6}

3

3.7    **Purchase Option**.

(a)    For purposes of this Section 3.7, the following terms shall have the following meanings:

(i)    "**Purchase Notice**" shall mean Licensee's irrevocable notice to Licensor that it is exercising the Purchase Option (as defined below) and may be delivered to Licensor at any time during the Term of this Agreement.

(ii)    "**Notice Effective Date**" shall mean the date specified by the Licensee in the Purchase Notice and shall be the last day of a month at least thirty (30) days following the date of the Purchase Notice.

(iii)    "**Closing**" shall mean the closing of the transactions contemplated by this Section 3.7 and shall take place on the last business day of the month immediately succeeding the Notice Effective Date.

(b)    During the Term of this Agreement, Licensee shall have the option to purchase (the "**Purchase Option**") the Licensed IP. Upon the exercise by Licensee of the Purchase Option, the parties will have a current transfer pricing analysis performed to determine the purchase price (the "**Purchase Price**") for the Licensed IP, and such Purchase Price as determined by the third party conducting the transfer pricing analysis shall be conclusive and binding on Licensor and Licensee.

(c)    At the Closing, the following actions will be taken:

(i)    Licensor will deliver to Licensee, duly executed, the following:

a.    An Intellectual Property Assignment substantially in the form attached as Exhibit B and any other documents reasonably necessary to record Licensee's intellectual property and proprietary rights in each of the countries covered by the Intellectual Property Assignment;

b.    A receipt for the Purchase Price, substantially in the form attached as Exhibit C; and

c.    Such other documents as are, in the reasonable opinion of counsel, necessary or desirable to consummate the transactions contemplated by this Section 3.7.

(ii)    Licensee will deliver to Licensor, duly executed, the following:

a.    The Purchase Price; and

b.    Such other documents as are, in the reasonable opinion of counsel, necessary or desirable to consummate the transactions contemplated by this Section 3.7.

{00021381 v6}

4.    **QUALITY STANDARDS; INTELLECTUAL PROPERTY**.

4.1    **Quality Standards.**

**(a)**    Trademark Use Approval.  Licensee shall furnish to Licensor prior to any use, for the approval of Licensor, copies of any products or other materials exhibiting or otherwise using the Trademarks (the "**Samples**") and copies of formats of all advertising, marketing, and promotional material on which the Trademarks appear (the "**Materials**").  Licensor shall have the right to approve or disapprove any or all Samples or Materials and Licensor's approval shall not be unreasonably withheld.  Any Samples and/or Materials submitted to Licensor shall be deemed approved unless Licensor notifies Licensee to the contrary in writing within thirty (30) days after Licensor's receipt of such Samples and/or Materials. Licensee shall not, and shall not allow any Sublicensee to, advertise, sell or provide any Services using the Licensed IP unless and until the Samples and Materials for such Services or packaging have been approved or deemed approved by Licensor pursuant to this Section 4.1.  Any Services provided, distributed, sold, and advertised by Licensee, or its Sublicensees, shall conform to the Sample approved or deemed approved by Licensor.  Licensor shall have the right to terminate the License and this Agreement upon Licensee's failure to have any Materials or advertisements approved after having received written notice from Licensor of such failure and an opportunity to cure.  Notwithstanding the foregoing, Licensor acknowledges that Licensee (or its Sublicensees) may have been using portions of the Licensed IP in connection with its provision of the Services prior to the Effective Date, and agrees that such use does not constitute a violation of or default under this Agreement, provided that from and after the Effective Date Licensee's and its Sublicensees' use of the Licensed IP complies in all respects with the terms and provisions of this Agreement.

**(b)**    All uses of the Licensed IP shall comply with Licensor's then-current Intellectual Property Usage Guidelines, the current version of which is attached hereto as Exhibit A and made a part hereof.  Licensor may modify such Intellectual Property Usage Guidelines from time to time in writing.

**(c)**    Licensee shall use reasonable commercial efforts to ensure that its Sublicensees promote the Services provided under the Licensed IP and coordinate the advertising and sale of the Services provided under the Licensed IP so as to maintain and enhance the value of the goodwill residing in the Licensed IP under this Agreement consistent with the quality standards established by Licensor.  Licensee shall ensure that all Sublicensees provide the Services in a manner consistent with a high quality independent nursery school through 12th Grade college preparatory school. Licensee shall not use, or allow any Sublicensee or any party with whom Licensee enters into an agreement regarding the Licensed IP, the Licensed IP in a manner that adversely impacts upon Licensor's or Licensor's reputation or the value of the Licensed IP.

**(d)**    Licensor shall have the discretion to determine the propriety of any use of the Licensed IP, provided such discretion is exercised in a commercially reasonable manner and in good faith and may generally review any aspect of such use from time to time through any means including site visits, curriculum review and monitoring of advertising and communications.  If Licensee continues to use any Licensed IP in an improper or objectionable manner in accordance with the foregoing sentence, after receiving written notice from Licensor that such usage constitutes improper usage, Licensor may terminate the License and this Agreement thirty (30) days after Licensee's receipt of the written notice.

**(e)**    Compliance With Laws.  Licensee shall comply at all times at its sole expense with all applicable laws and regulations pertaining to the performance, promotion and delivery of the Services.

{00021381 v6}

5

4.2    **Intellectual Property**.

(a)    Use of Similar Marks. Licensee shall at no time adopt or use, without Licensor's prior written consent, any variation of the Licensed IP, including translations, or any mark likely to be similar to or confusing with the Licensed IP. In the event that Licensor consents to any variation of the Licensed IP, Licensee hereby agrees that Licensor shall own such new mark and shall, at its cost and expense, file and obtain in Licensor's name all United States and international trademark registrations. Licensor agrees to give Licensee reasonable assistance, including execution and delivery of all documents required by Licensee, in filing such applications for trademark registration.

(b)    Good Faith. Licensee agrees that it shall provide the Services in a dignified manner, consistent with and enhancing the general reputation of the Licensed IP and Licensor, and in accordance with good trademark and copyright practice.

(c)    Goodwill. Any and all goodwill arising from Licensee's use of the Licensed IP shall inure solely to the benefit of Licensor and Licensee shall not assert any claim to the Licensed IP or such goodwill either during or after the Term of this Agreement. Licensee shall not take any action that could be detrimental to the goodwill associated with the Licensed IP or with Licensor.

(d)    Cooperation. Licensee shall, during the term of this Agreement and after termination hereof, execute such documents as Licensor may request from time to time to ensure that all right, title and interest in and to the Intellectual Property reside with Licensor.

(e)    Survival. The provisions of this Subsection 4.2 shall survive any termination or expiration of this Agreement.

5.    **REPRESENTATIONS AND WARRANTIES; LIMITATION OF LIABILITY.**

5.1    **Licensor's Warranties And Representations:** Licensor represents and warrants to Licensee that:

(a)    It has, and will have throughout the Term of this Agreement, the right to license the Licensed IP to Licensee in accordance with the terms and provisions of this Agreement; and

(b)    The making of this Agreement by Licensor does not violate any agreements to which Licensor is a party.

5.2    **Licensee's Warranties And Representations:** Licensee represents and warrants to Licensor that, during the Term and thereafter:

(a)    It will not attack the title of Licensor (or third parties that have granted rights to Licensor) or Licensor in and to the Licensed IP or any copyright or trademarks pertaining thereto, nor will it attack the validity of the License granted hereunder;

(b)    It will not harm, misuse or bring into disrepute the License IP, or allow the Licensed IP to be harmed, misused or brought into disrepute, but on the contrary, will maintain the value and reputation thereof to the best of its ability; and

(c)    It will promote, perform, display and distribute, and take reasonable commercial steps to ensure that all Sublicensees promote, perform, display and distribute, the Services in an ethical manner and in accordance with the terms and intent of this Agreement.

{00021381 v6}

6

5.3     EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, LICENSOR EXPRESSLY DISCLAIMS AND EXCLUDES ALL REPRESENTATIONS, CONDITIONS, WARRANTIES OR GUARANTEES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, ORAL OR WRITTEN, WITH RESPECT TO THIS AGREEMENT, THE LICENSE GRANTED HEREIN, AND THE LICENSED IP, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, ANY IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, ANY IMPLIED WARRANTY OF FREEDOM FROM INFRINGEMENT OF ANY INTELLECTUAL PROPERTY RIGHTS OR OTHER RIGHTS, OR ANY IMPLIED WARRANTY ARISING FROM THE COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE.

5.4     TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL LICENSOR OR ITS OFFICERS, DIRECTORS, EMPLOYEES, SHAREHOLDERS, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS OR REVENUE, ANY BUSINESS OR WORK INTERRUPTION OR OTHER PECUNIARY LAWS, ANY LOSS OF PROSPECTIVE PROFITS, OR ANY EXPENDITURES, INVESTMENTS OR COMMITMENTS MADE IN CONNECTION WITH THE ESTABLISHMENT, DEVELOPMENT OR MAINTENANCE OF BUSINESS OR BUSINESS RELATIONSHIPS, ARISING OUT OF THIS AGREEMENT OR WITH RESPECT TO THE LICENSED IP.

5.5     NEITHER LICENSOR NOR ITS AFFILIATES NOR THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, SHAREHOLDERS, AGENTS, OR REPRESENTATIVES SHALL BE LIABLE TO LICENSEE FOR DAMAGES OF ANY KIND (EXCEPT FOR PERSONAL INJURY) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT IN ANY AMOUNT WHICH SHALL EXCEED THE FEES ACTUALLY PAID TO SUBLICENSOR HEREUNDER DURING THE SIX (6) MONTH PERIOD PRIOR TO THE APPLICABLE CLAIM UNDER THIS AGREEMENT, REGARDLESS OF THE FORM OF ACTION, WHETHER BASED ON CONTRACT, TORT, WARRANTY, NEGLIGENCE, STRICT LIABILITY, PRODUCTS LIABILITY OR OTHERWISE.   THE LIMITATIONS OF LIABILITY SET FORTH IN THIS SECTION REPRESENT A FUNDAMENTAL TERM OF THIS AGREEMENT AND NEITHER PARTY WOULD HAVE ENTERED INTO THIS AGREEMENT WITHOUT THEIR INCLUSION.

**6.     CONFIDENTIALITY.**

6.1     **Disclosure.**  In order to protect and prevent disclosures of the Licensed IP and the IP Documentation, Licensee must (a) exercise at a minimum the same care it would exercise to protect its own confidential information; and (b) not use, reproduce, distribute, disclose, or otherwise disseminate the Licensed IP or the IP Documentation related thereto except (i) as expressly set forth in this Agreement; (ii) as authorized in writing in advance by Licensor; or (iii) as required by applicable law.  In the event of a disclosure required by an applicable law, Licensee must first give written notice of such required disclosure to Licensor, make a reasonable effort to obtain a protective order requiring that the Licensed IP and/or the IP Documentation so disclosed be used only for the purposes for which disclosure is required, take reasonable steps to allow Licensor to seek to protect the confidentiality of the Licensed IP or IP Documentation required to be disclosed, and shall disclose only that part of the Licensed IP or IP Documentation which, in the written opinion of Licensee's legal counsel, it is required to disclose.  In no event shall Licensee exercise less than a reasonable standard of care to keep confidential the Licensed IP and the IP Documentation.

{00021381 v6}

7

6.2     **Property**.  All Licensed IP and the IP Documentation are and shall remain property of Licensor.

6.3     **Need to Know**.  Licensee may make disclosures of the Licensed IP and the IP Documentation only to Sublicensees for purposes related to the exercise of the rights granted in this Agreement and to Representatives of Licensee who are directly involved in evaluating and/or performing this Agreement, have a specific "need-to-know" such information, and have obligated themselves to hold the Licensed IP and IP Documentation in confidence and otherwise agree to be bound by and comply with the terms and provisions of this Agreement to the same extent as if a signatory hereto.  Licensee agrees to diligently monitor each such Sublicensee and Representative and, upon request by Licensor, promptly to furnish to Licensor a list of Licensee's Sublicensees and Representatives having had access to the Licensed IP or the IP Documentation.

6.4     **Notification**.  Licensee shall notify Licensor immediately upon discovery of any unauthorized use or disclosure of the Licensed IP or IP Documentation, or any other breach of the confidentiality provisions of this Agreement by Licensee or any Sublicensee or Representative of Licensee, and will cooperate with Licensor in every reasonable way to help Licensor regain possession of the Licensed IP or IP Documentation and prevent its further unauthorized use or disclosure.  Licensee shall be responsible for the acts of any Sublicensee or Licensee Representative that is in violation of this Agreement.

6.5     **Return**.  Within seven (7) business days following the receipt of a written request from Licensor, Licensee must deliver to Licensor all tangible materials containing or embodying the Licensed IP or the IP Documentation in Licensee's possession or, at Licensor's option, certify that all such materials in Licensee's possession have been destroyed.

6.6     **Survival**.  The covenants of confidentiality set forth in this Agreement (a) will apply after the Effective Date to all the Licensed IP and IP Documentation disclosed to Licensee before and after the Effective Date and (b) will continue and must be maintained from the Effective Date through the termination or expiration of this Agreement and (i) with respect to each Trade Secret, at any and all times after the termination or expiration of the Agreement during which the Trade Secret retains its status as a "trade secret" under applicable law; and (ii) with respect to Confidential Information, for a period equal to five (5) years after the expiration or termination of this Agreement.

7.     **TERM AND TERMINATION**

7.1     **Term**.  This Agreement shall come into force as of the Effective Date and shall, unless otherwise terminated as provided herein, remain in effect thereafter for an initial term (the "Term") of Twenty (20) years.  The Initial Term may only be extended in a writing signed by authorized Representatives of both parties.

7.2     **Termination By Licensor**. Licensor shall have the right to terminate this Agreement without prejudice to any rights which it may have, whether pursuant to the provisions of this Agreement, at law or in equity, or otherwise, upon the occurrence of any one or more of the following events (herein called "defaults"):

(a)     Licensee defaults in the performance of any of its obligations (including Licensee's warranties, representations and the provisions of Section 5.1) provided for in this Agreement; or

{00021381 v6}

(b)    Licensee shall fail to make any payments due on the date due; or

(c)    Licensee shall fail to deliver any of the statements required herein or to give access to the premises and/or license records pursuant to the provisions hereof to Licensor's authorized Representatives; or

(d)    Licensee shall fail to comply with any laws or regulations as provided in this Agreement, or if any governmental agency or other body, office or official vested with appropriate authority finds that the Services are being performed, promoted or delivered in contravention of applicable laws, regulations or standards, or in a manner likely to cause harm; or

(e)    Licensee shall be unable to pay its debts when due, or shall make any assignment for the benefit of creditors, or shall file any petition under the bankruptcy or insolvency laws of any jurisdiction, county or place, or shall have or suffer a receiver or trustee to be appointed for its business or property, or be adjudicated a bankrupt or an insolvent; or

(f)    Licensee has made a material misrepresentation or has omitted to state a material fact necessary to make any representation not misleading in connection with inducing Licensor to enter into this Agreement or otherwise in connection with Licensee's performance under this Agreement;

(g)    Licensee uses, in any manner, any property or properties owned or controlled by Licensor or Licensor not included as Licensed IP under this Agreement (except as may be authorized prior to such use pursuant to any separate, written agreement(s) between the parties hereto);

(h)    Licensee executes a sublicense agreement that fails to comply in all respects with the requirements of Section 3.5 of this Agreement·

7.3    In the event any of these defaults occur, Licensor shall give notice of termination in writing to Licensee in the manner prescribed in Section 10.4, below. Licensee shall have ten (10) days from the date of giving notice in which to correct any of these defaults (except subdivisions (d), (e) and (h) above which are not curable), and failing such, this Agreement, the License and all rights granted to Licensee hereunder shall thereupon immediately terminate and Licensee shall immediately cease the use of the Licensed IP and IP Documentation, and any and all payments then or later due from Licensee shall then be immediately due and payable in full and no portion of those prior payments shall be repayable to Licensee. Licensee acknowledges that Licensee's failure to cease the use of the Licensed IP upon termination of this Agreement will result in immediate and irreparable damage to Licensor and to the rights of any subsequent Licensee. Licensee acknowledges and admits that there is no adequate remedy at law for such failure, and agrees that in the event of such failure, Licensee waives (1) any objection to Licensor's application for equitable relief based upon the adequacy of money damages, (2) any requirement that Licensor submit proof of the value of the Licensed IP; and (3) any requirement that Licensor submit a bond.

## 8.    INFRINGEMENT.

8.1    **Defense**. Licensor shall have the sole right, exercisable in its sole discretion, to defend the Licensed IP against infringement or misappropriation by third parties.

8.2    **Cooperation**. Licensee agrees to fully cooperate with Licensor in the prosecution of any action brought to defend the Licensed IP against infringement or misappropriation by third parties. Licensor agrees to reimburse Licensee for its reasonable expenses actually incurred in providing such assistance under this Section 8.

9.    **INDEMNITY.**

9.1    During the Term, and continuing after the expiration or termination of this Agreement, Licensor shall indemnify Licensee and shall hold it harmless from any loss, liability, damage, cost or expense, arising out of any third party claims or suits which may be brought or made against Licensee by reason of the breach by Licensor of the warranties or representations as set forth in Section 5 hereof, provided that Licensee shall give prompt written notice, and full cooperation and assistance to Licensor relative to any such claim or suit and provided, further, that Licensor shall have the option to undertake and conduct the defense of any suit so brought. Licensee shall not, however, be entitled to recover for lost profits. Licensee shall cooperate fully in all respects with Licensor in the conduct and defense of said suit and/or proceedings related thereto.

9.2    During the Term, and continuing after the expiration or termination of this Agreement, Licensee shall indemnify Licensor and each of its Affiliates and shall hold them harmless from any loss, liability, damage, cost or expense arising out of any third party claims or suits which may be brought or made against Licensor or any of its Affiliates, by reason of: (i) any breach of Licensee's representations, warranties or covenants in this Agreement; (ii) any unauthorized use by Licensee of the Licensed IP; (iii) any use of any trademark or copyright (except trademarks or copyrights in the Licensed IP used in accordance with the terms of this Agreement), design, patent, process, method or device; and (iv) Licensee's non-compliance with any applicable federal, state or local laws or with any other applicable regulations.

10.    **MISCELLANEOUS.**

10.1    **No Other Rights; Relationship of the Parties**. Except as otherwise provided herein no license or other rights, express or implied, are granted to either party. The relationship of Licensee to Licensor is that of an independent contractor and neither Licensee nor its agents or employees shall be considered employees of Licensor. This Agreement does not constitute and shall not be construed as constituting a partnership or joint venture or grant of a franchise between Licensor and Licensee. This Agreement shall not be construed as authority for either party to act for the other party in any agency or other capacity or to make commitments of any kind for the account of or on behalf of the other, except to the extent and for the purposes provided herein.

10.2    **Assignment; Binding Effect**. This Agreement and the License are personal to Licensee. Neither this Agreement nor all or any portion of the rights licensed to Licensee herein shall be licensed, sublicensed, assigned, transferred or otherwise conveyed by Licensee to any other person or entity without the prior written consent of Licensor. Any such attempted transfer, license, sublicense or other conveyance of rights by Licensee without Licensor's express written consent shall be invalid. For purposes of this Section 10.2, "assignment" shall be deemed to include, without limitation, any sale, transfer, merger, reorganization, or change in control by, of, with, or between Licensee. The rights and obligations of the parties hereto shall inure to the benefit of, and be binding and enforceable upon, the respective successors and assigns of the parties. Licensor may assign this Agreement and its rights and obligations hereunder without Licensee's consent but with prior notice to Licensee.

{00021381 v6}

10

10.3    **Entire Agreement; Captions; Amendments; Waiver.** This Agreement, together with the Schedules and Exhibits hereto, constitutes the entire understanding of the parties hereto concerning the subject matter hereof, all prior understandings having been merged herein. This Agreement supersedes and replaces any prior or previously existing agreement or understanding between the parties. The captions and headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation hereof. This Agreement cannot be modified or amended except by a writing signed by the parties hereto. No waiver by any party of any breach of any provision hereof shall constitute a waiver of any other breach of that or any other provision hereof.

10.4    **Notices.** Any notice of default, breach or termination shall be given in writing and shall be deemed given on the earlier of the date (a) actually received and acknowledged, or (b) immediately following its delivery, evidenced by receipt, to any reputable overnight carrier, in each case addressed to the intended recipient at its address set forth as follows:

> If to Licensor:
>
> New York Preparatory School, Inc.
> Attn:  Stephen H. Spahn
> 291 Central Park West
> New York, New York 10024
>
> If to Licensee
>
> Legacy Global Group, LLC
> Attn:  Kirk R. Spahn
> 291 Central Park West
> New York, NY 10024

The places to which notices are to be given may be changed from time to time by written notice to all other parties as aforesaid.

10.5    **Governing Law; Jurisdiction; Venue; Interpretation; Attorneys' Fees.**  This Agreement shall be governed by, and interpreted under, the laws of the State of New York applicable to contracts made and to be performed therein, without giving effect to the principles of conflicts of law. Except in respect to an action commenced by a third party in another jurisdiction, the parties hereto hereby agree that any legal suit action, or proceeding arising out of or relating to this Agreement must be instituted in a federal or state court location in New York County, New York, and the parties hereto hereby irrevocably submit to the jurisdiction of any such court and waive any objection to the application of the laws of the State of New York, the laying of venue in, jurisdiction over their person in, or the inconvenience of, such forum. Should any provision of this Agreement require judicial interpretation, the Court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the party who itself or through its agents prepared the same, it being agreed that the agents of all parties have participated in the preparation hereof. In connection with any litigation brought which arises out of or relates to this Agreement, the prevailing parties shall be entitled to recover all costs and expenses therein incurred including reasonable attorneys' fees at trial and on appeal.

{00021381 v6}

11

10.6    **Time and Performance.**  Time shall be of the essence with respect to the entire Agreement and each provision herein.  Notwithstanding the foregoing, dates or times by which either party is required to make performance under this Agreement shall be postponed automatically to the extent that such party is prevented from meeting them by causes beyond its reasonable control.

10.7    **Attorneys' Fees.**  The prevailing party in any action arising under this Agreement shall be entitled to collect its reasonable attorneys' fees from the non-prevailing party.  In the event that any such action is resolved by a settlement agreement, then neither party shall be deemed the "prevailing party" and each party shall be responsible for its own attorneys' fees.

10.8    **Acceptance by Licensor.**  This Agreement, when signed by Licensee, shall be deemed an application for license and not a binding agreement unless and until accepted by Licensor by signature of a duly authorized officer and the delivery of such a signed copy to Licensee.  The receipt and/or deposit of any check or other consideration given by Licensee and/or delivery of any material by Licensor to Licensee shall not be deemed an acceptance by Licensor of this application.  The foregoing shall apply to any documents relating to renewals or modifications of this Agreement.

10.9    **Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered by facsimile, electronic mail (including .pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes, provided that any party providing a counterpart by facsimile, electronic mail or other transmission shall also provide an original of such counterpart to the other party by overnight courier within one (1) business day after delivery of the electronic mail or facsimile copy.

10.10    **Amendment to Licensed IP Schedule.**  The parties agree that the Licensed IP schedule attached hereto as Schedule 1 may be amended from time to time in accordance with Section 10.3.

10.11    **Bankruptcy Provisions.**

(a)    The parties hereby agree and intend that this Agreement is an executory contract governed by Section 365 of the U.S. Bankruptcy Code ("**Bankruptcy Code**").

(b)    In the event of Licensee's bankruptcy, the parties intend that any royalties payable under this Agreement during the bankruptcy period be deemed administrative claims under the Bankruptcy Code because the parties recognize and agree that the bankruptcy estate's enjoyment of this Agreement will (i) provide a material benefit to the bankruptcy estate during its reorganization and (ii) deny Licensor the benefit of the exploitation of the rights through alternate means during the bankruptcy reorganization.

(c)    The parties acknowledge and agree that any delay in the decision of the trustee of the bankruptcy estate to assume or reject the Agreement (the "**Decision Period**") materially harms Licensor by interfering with Licensor's ability to alternatively exploit the rights granted under this Agreement during a Decision Period of uncertain duration. The parties recognize that arranging appropriate alternative exploitation would be a time consuming and expensive process and that it is unreasonable for Licensor to endure a Decision Period of extended uncertainty. Therefore, the parties agree that the Decision Period shall not exceed sixty (60) days.

10.12    **Severability.** The invalidity of any portion of this Agreement shall not be deemed to affect the validity of any other provision, and any such finding of invalidity or unenforceability in any

{00021381 v6}

jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. In the event that any provision of this Agreement is held to be invalid or unenforceable, the parties agree that the remaining provisions shall be deemed to be in full force and effect as if they had been executed by both parties subsequent to the expungement of the invalid provision. It is expressly understood, however, that the parties hereto intend each and every provision of this Agreement to be valid and enforceable, and hereby knowingly waive all rights to object to any provision of this Agreement. Accordingly, if any part of this Agreement is determined to be invalid or unenforceable pursuant to applicable law, then: (a) any invalid or unenforceable provisions will, rather than be stricken in their entirety, be superseded by valid and enforceable provisions that most closely match the intent of the original provision; and (b) the remainder of the Agreement shall continue in effect.

**[Signatures follow on next page.]**

{00021381 v6}

13

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the Effective Date.

**LICENSOR:**

**LICENSEE:**

**NEW YORK PREPARATORY SCHOOL, INC.**

**LEGACY GLOBAL GROUP, LLC**

By: _____
Title: _____

STEPHEN Spahn
Chancellor

By: _____
Title: _____

Kirk Spahn
chairman

{00021381 v6}

*Last Updated: October 21, 2013*

**SCHEDULE 1**

| TRADEMARKS | |
|---|---|
| **Trademark** | **Application/Registration Number** |
| The Dwight School(s)® | *USPTO Reg. No. 4,414,902; Madrid Protocol International Application No. A0035023* |
| Dwight School New York™ | *USPTO Serial No. 85886602* |
| Dwight School Canada™ | |
| Dwight School Seoul® | *USPTO Reg. No. 4,413,997; Madrid Protocol International Application No. A0035768* |
| Dwight School in China™ | |
| Dwight Summer Day Camp® | *USPTO Reg. No. 4,413,997* |
| Dwight Early Childhood Division® | *USPTO Reg. No. 4,414,908* |
| Dwight Today™ | |
| Dwight Global Leaders™ | |
| Quest™ | *USPTO Serial No. 85929918; Madrid Protocol International Application No. A0035766* |
| Dwight Lions™ | |
| "Spark of Genius" ™ | *USPTO Serial No. 85929680; Madrid Protocol International Application No. A0035762* |
| "Igniting the Spark of Genius in Every Child" ™ | *USPTO Serial No. 8592961; Madrid Protocol International Application No. A0035763* |
| "Three Pillars (Personalized Learning, Community, Global Vision)" ™ | *USPTO Serial No. 85929735; Madrid Protocol International Application No. A0035765* |
| **LOGOS** | |
| **Trademark** | **Application Number** |
| School Crest (See Schedule 1-A) | *USPTO Serial No. 85931924; Madrid Protocol International Reg. No. 1165249* |
| Lion Graphic (See Schedule 1-A) | *USPTO Serial Nos. 85931730; Madrid Protocol International Application No. A0035786* |
| Lion Graphic Athletic Lion (See Schedule 1-A) | *USPTO Serial Nos. 85931954; Madrid Protocol International Application No. A0035793* |
| Lion Graphic Young Lion (See Schedule 1-A) | *USPTO Serial Nos. 8593178; Madrid Protocol International Application No. A0035791* |
| **COPYRIGHTS** | |
| **Copyright Material** | **Application Number** |
| Dwight School Admission Viewbook | *United States Copyright Number TXu001853639* |
| Dwight School Pre-K Through 12th Grade Curriculum Guide | *United States Copyright Number TX0007680966* |
| Dwight School Website located at URL: www.dwight.edu | *United States Copyright Office Case No. 1-895643921* |
| Dwight School Curriculum Maps | *United States Copyright Office Case No. 1-972973951* |

## SCHEDULE 1-A

School Crest



Lion Graphics







{00024453 v1}

## EXHIBIT A

**Intellectual Property Usage Guidelines**

1.      You may not use any Licensed IP on or in connection with any obscene or pornographic materials, and your use of any Licensed IP may not be disparaging, defamatory, or libelous to Licensor, any of its services, or any person or entity.

2.      When referencing any Trademark, please mark with a ™ or ® as indicated in the Trademark List.

3.      You may not shorten or abbreviate any Trademark. Always spell out and capitalize Trademarks exactly as they appear in the Trademark List.

4.      You should include the following trademark attribution statement: "[List of marks used, with 'Dwight School' first, if used, followed by other Licensor marks used, in alphabetical order] are either registered trademarks or trademarks of New York Preparatory School, Inc. in the United States and/or other countries."

{00021381 v6}

**EXHIBIT B**

**FORM OF ASSIGNMENT OF INTELLECTUAL PROPERTY**

**WHEREAS**, New York Preparatory School, Inc., a New York education corporation, having its principal place of business at 291 Central Park West, New York, New York 10024 (hereinafter "**Assignor**"), is the owner of the trademarks and copyrights and the trademark and copyright registrations and applications set forth on Schedule A of this Assignment (hereinafter collectively referred to as the "**Intellectual Property**");

**WHEREAS**, Legacy Global Group, LLC, a New York limited liability company, having its principal place of business at _____ (hereinafter "**Assignee**"), desires to acquire all right, title and interest in and to the Intellectual Property, together with the goodwill of the business symbolized by the Intellectual Property; and

**WHEREAS**, Assignor and Assignee are desirous of making this Assignment a matter of record.

**NOW, THEREFORE**, in accordance with Assignee's option in the Intellectual Property License Agreement and Option to Purchase and for good and valuable consideration the full receipt and sufficiency of which is hereby acknowledged (further detailed in said License), and intending to be legally bound hereby, Assignor hereby sells, assigns, transfers and conveys unto Assignee all of its right, title, and interest in and to the aforesaid Intellectual Property, together with the goodwill of the business symbolized by the Intellectual Property.

**FURTHER**, Assignor hereby covenants, agrees and undertakes to execute all confirmatory assignments, lawful oaths, and any other papers which Assignee may reasonably deem necessary or desirable for securing to Assignee or for maintaining for Assignee the Intellectual Property hereby assigned, all without further compensation to Assignor.

IN WITNESS WHEREOF, the parties have duly executed this Assignment as of _____, 20___.

**ASSIGNOR:**

**NEW YORK PREPARATORY SCHOOL, INC.**

By: _Stephen Spahn_

Title: _Chancellor_

**ASSIGNEE:**

**LEGACY GLOBAL GROUP, LLC**

By: _Kirk Spahn_

Title: _Chairman_

{00021381 v6}

## Schedule A to Assignment

**[To be drafted upon exercise of option.]**

{00021381 v6}

## EXHIBIT C

## PURCHASE PRICE RECEIPT

Pursuant to the Intellectual Property License Agreement and Option to Purchase effective _____, 2013 (the "**Agreement**") between New York Preparatory School, Inc., a New York education corporation ("**Licensee**") and Legacy Global Group, LLC, a New York limited liability company ("**Licensor**"), Licensor hereby acknowledges receipt from Licensee of **[insert Purchase Price]** as a result of Licensee exercising its Purchase Option pursuant to the Agreement.

Dated:  [Insert date of Closing]

**ASSIGNOR:**

**NEW YORK PREPARATORY SCHOOL, INC.**

By:  STEPHEN Spahn
Title:  Chancellor

Accepted and Agreed:

**ASSIGNEE**:

**LEGACY GLOBAL GROUP, LLC**

By:  Kirk Spahn
Title:  Chairman

{00021381 v6}